[Nos. 61175-1; 61237-4; En Banc. May 11, 1995.]
61361-3.

The State of Washington, *Respondent*, v. Steven W. Ritchie, *Petitioner*.

The State of Washington, *Respondent*, v. Jeffrey M. Hamrick, *Petitioner*.

The State of Washington, *Respondent*, v. Jai-Mar Eli Scott, *Petitioner*.

*Crawford, McGilliard, Peterson, Yelish & Dixon* and *Steve Dixon,* for petitioner Ritchie.

*Law Offices of Monte E. Hester, Inc., P.S.,* by *Wayne C. Fricke,* for petitioner Hamrick.

*Constance M. Krontz* of *Washington Appellate Defender Association,* for petitioner Scott.

*Russell D. Hauge, Prosecuting Attorney for Kitsap County,* and *Pamela B. Loginsky* and *Ione S. George, Deputies; Nelson Hunt, Prosecuting Attorney for Lewis County; Norm Maleng, Prosecuting Attorney for King County,* and *Kerry J. Keefe, Senior Deputy,* for respondent.

*Jeff Ellis* on behalf of Washington Defender Association, amicus curiae for petitioners.

BRACHTENBACH, J.* — These cases involve exceptional sentences above the standard range. *State v. Scott,* 72 Wn. App. 207, 866 P.2d 1258 (1993); *State v. Hamrick,* unpublished decision noted at 71 Wn. App. 1071 (1993), *review granted,* 125 Wn.2d 1007 (1994); and State v. Ritchie, unpublished commissioner's decision, *review granted,* 125 Wn.2d 1007 (1994). We granted petitions for review, but limited review to the length of the exceptional sentence. We affirm in each case.

Defendants and amicus curiae urge that we judicially impose requirements and limitations on the length of excep-

---

*Judge Robert F. Brachtenbach is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).

tional sentences above the standard range. Our references to exceptional sentences are limited to those above the standard range.

The requirements and limitations urged by Defendants and amicus curiae are summarized as follows: (1) trial courts must state the reasons for a particular length of an exceptional sentence which reasons cannot be at odds with the purpose of the Sentencing Reform Act of 1981 (SRA); (2) such sentence must be proportionate to all sentences in similar cases with the same salient factors; (3) such sentence must be compared to the average sentence for the involved crime; (4) comparison must be made to the average sentence for more serious crimes; and (5) comparison must be made to the midpoint sentence of the standard range for this crime. We reject all of the suggested requirements and limitations.

The foundation of Defendants' suggestions is the general declaration of purpose in the SRA, citing particularly RCW 9.94A.010(1) and (3) which provide:

> (1) Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;
>
> . . . .
>
> (3) Be commensurate with the punishment imposed on others committing similar offenses;

Equally important are sections (2) and (4):

> (2) Promote respect for the law by providing punishment which is just;
>
> . . . .
>
> (4) Protect the public[.]

We start with the relevant sections of the statute. The trial court may impose an exceptional sentence only "if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.120(2). It is important to note that the trial court, when deciding to impose an exceptional sentence, is directed specifically to consider the purpose of the SRA. No such direction is given to the appellate court in RCW 9.94A.210 which governs the method and extent of

appellate review. Indeed, the statute provides an exceptional sentence is "subject to review *only* as provided for in RCW 9.94A.210(4)". (Italics ours.) RCW 9.94A.390. None of the suggested requirements or limitations is provided for in RCW 9.94A.210(4), nor is any implied.

Thus the SRA itself rejects the idea that appellate review is subordinated to the general declaration of purpose. In contrast, only in deciding to *impose* an exceptional sentence is any court directed to consider the general statement of purpose of the SRA. Rather, review is specifically restricted and constrained by the declaration that it shall be *only* as provided for in RCW 9.94A.210(4). RCW 9.94A.390.

We first consider whether the trial court must articulate reasons for the length of an exceptional sentence. No language in the SRA imposed such a requirement; indeed, the statute strongly suggests otherwise. When the Legislature wanted a statement of reasons for a particular decision it so stated in clear language. RCW 9.94A.120(3) requires the trial court to set forth reasons for its decision to *impose* an exceptional sentence. There is no such statutory requirement as to the *length* of an exceptional sentence.

As noted, appellate review is limited by the statute. An exceptional sentence must be reversed if the reasons for the exceptional sentence are not supported by the record or if those reasons do not justify an exceptional sentence. RCW 9.94A.210(4). If the reasons are supported by the record, and justify an exceptional sentence, then, to reverse an exceptional sentence, we *must* find "that the sentence imposed was *clearly excessive or clearly too lenient*". (Italics ours.) RCW 9.94A.210(4)(b).

■ Starting with *State v. Oxborrow*, 106 Wn.2d 525, 530, 723 P.2d 1123 (1986), we consistently have held that the "length of an exceptional sentence should not be reversed as 'clearly excessive' absent an abuse of discretion." *Oxborrow*, at 530. *State v. McAlpin*, 108 Wn.2d 458, 467, 740 P.2d 824 (1987); *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987); *State v. Pryor*, 115 Wn.2d 445, 450, 799 P.2d 244 (1990); *State v. Stephens*, 116 Wn.2d 238,

245, 803 P.2d 319 (1991); *State v. Batista*, 116 Wn.2d 777, 792, 808 P.2d 1141 (1991).

The statute does not define "clearly excessive", but *Oxborrow* provided a definition. There we explained that our adoption of the abuse of discretion standard was based on three important sources. First, we examined the language of the SRA. Second, we noted that the Sentencing Guidelines Commission stated that an exceptional sentence "shall be subject to review only for abuse of discretion". Third, *Oxborrow* adopted the interpretation of identical language in the Juvenile Justice Act of 1977. *Oxborrow*, at 530-31.

> The term "clearly excessive" is not defined in the Juvenile Justice Act of 1977 and, therefore, must be given its plain and ordinary meaning. Action is excessive if it "goes beyond the usual, reasonable, or lawful limit." Thus, for action to be *clearly* excessive, it must be shown to be clearly unreasonable, *i.e.*, exercised on untenable grounds or for untenable reasons, or an action that no reasonable person would have taken.

*Oxborrow*, at 531 (quoting *State v. Strong*, 23 Wn. App. 789, 794, 599 P.2d 20 (1979)). The rationale of *Oxborrow* bears repeating because it is solidly grounded and remains valid.

■ Thus, from 1979 in *State v. Strong, supra,* and from 1986 in *Oxborrow*, the Legislature has known the judicial definition of the standard of "clearly excessive" and that it is subject to an abuse of discretion standard of review. The Legislature is presumed to be aware of judicial interpretation of its statutes. *Friends of Snoqualmie Vly. v. King Cy. Boundary Review Bd.*, 118 Wn.2d 488, 496, 825 P.2d 300 (1992).

■ Another principle of statutory construction lends compelling weight to adhering to the *Oxborrow* holdings. "Legislative silence regarding the construed portion of the statute in a subsequent amendment creates a presumption of acquiescence in that construction." *Baker v. Leonard*, 120 Wn.2d 538, 545, 843 P.2d 1050 (1993). The Legislature has amended RCW 9.94A.210, but did not change the "clearly excessive" language. Laws of 1989, ch. 214, § 1.

Legislative acquiescence is significant in light of various dissents in our cases which have quarreled with the consistent majority opinions defining and applying the abuse of discretion standard. *See, e.g., State v. Armstrong,* 106 Wn.2d 547, 552, 723 P.2d 1111 (1986); *Oxborrow,* at 539. Interestingly the majority of our cases applying the abuse of discretion standard of review are unanimous. *See, e.g., State v. McAlpin, supra; State v. Dunaway, supra; State v. Pryor, supra; State v. Stephens, supra.*

■ Fixing of punishment for crimes is a legislative function. *State v. Ammons,* 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986). We have observed that any judicial dissatisfaction with the sentencing scheme goes to the "wisdom of the dispositional standards" and "it is the function of the legislature and not the judiciary to alter the sentencing process." (Citation omitted.) *State v. Bryan,* 93 Wn.2d 177, 181, 606 P.2d 1228 (1980). To impose the requirements and limitations proposed by Defendants would be contrary to legislative intent.

■ We turn to the particular proposals of Defendants. First, they would require the trial court to state reasons for the length of a sentence outside the standard range. As discussed above, the language of the SRA not only does not mandate that, but strongly militates against such interpretation. We have never held that there is any such requirement, despite the urging of the dissent in *State v. Smith,* 123 Wn.2d 51, 59, 864 P.2d 1371 (1993) (Madsen, J., dissenting).

Decisions of the Court of Appeals which take a contrary view are not correct. For example, *State v. Elsberry,* 69 Wn. App. 793, 796, 850 P.2d 590 (1993) states that "[t]enable grounds or tenable reasons for any exceptional sentence must be stated in the record. . . . [T]here must be a reasonable connection between the reasons given and the duration of the sentence." For the latter proposition, *Elsberry* cites *State v. Chadderton,* 119 Wn.2d 390, 399, 832 P.2d 481 (1992). In fact, *Chadderton* has nothing to do with the *length* of an exceptional sentence; it concerned only the rea-

sons for imposing an exceptional sentence. The foundation of *Elsberry*'s above holding is wholly faulty. It is overruled to the extent inconsistent herewith.

*State v. Pryor*, 56 Wn. App. 107, 782 P.2d 1076 (1989), *aff'd on other grounds*, 115 Wn.2d 445, 799 P.2d 244 (1990) attempted to impose requirements on trial courts which had not then and never have been approved by this court. The Court of Appeals found an abuse of discretion in the sentence. On review, we affirmed on different grounds, but specifically reiterated the abuse of discretion standard. We did not embrace the Court of Appeals requirement that trial courts should "fully state" their reasons for the length of an exceptional sentence. *Pryor* is overruled to the extent inconsistent herewith.

Another example of error is *State v. George*, 67 Wn. App. 217, 227, 834 P.2d 664 (1992), *review denied*, 120 Wn.2d 1023 (1993). Citing only *Pryor*, it required a statement of reasons for the length of the sentence. That holding is overruled. Additionally, the *George* court stated:

> The Washington Supreme Court has admonished that "[t]he maximum sentence is to be imposed for only the 'worst case' scenario when the 'circumstances of the crime distinguish it from other crimes of the same statutory category.' "

*George*, at 227. The only Supreme Court case cited for that proposition is *State v. Armstrong, supra*. The Court of Appeals omits one minor fact — it was quoting from the dissent.

The Court of Appeals, Division One, has held correctly that "the sentencing court need not state reasons in addition to those relied upon to justify the imposition of an exceptional sentence above the standard range in the first instance to justify the length of the sentence imposed." (Footnote omitted.) *State v. Ross*, 71 Wn. App. 556, 573, 861 P.2d 473 (1993). We agree.

The analysis in *Ross* explains well the status of the law:

> A careful examination of each of the words used to explain the abuse of discretion standard demonstrates why the pattern in the vast majority of cases cited above has developed. In order to abuse its discretion in determining the length of an

exceptional sentence above the standard range, the trial court must do one of two things: rely on an impermissible reason (the "untenable grounds/untenable reasons" prong of the standard) or impose a sentence which is so long that, in light of the record, it shocks the conscience of the reviewing court (the "no reasonable person" prong of the standard). Indeed, once a reviewing court has determined that the facts support the reasons given for exceeding the range and that those reasons are substantial and compelling, there is often nothing more to say. The trial and appellate courts simply reiterate those reasons to explain why a particular number of months is appropriate. This is what our courts refer to when they recite that the length of the sentence must have "some basis in the record". *See, e.g.,* [*State v.*] *Brown,* 60 Wn. App. [60,] at 77[, 802 P.2d 803 (1990), *review denied,* 116 Wn.2d 1025 (1991)]; *State v. Sanchez,* 69 Wn. App. 195, 208, 848 P.2d 735, *review denied,* 121 Wn.2d 1031 (1993).

(Footnote omitted.) *Ross,* at 571-72. *Accord State v. Bedker,* 74 Wn. App. 87, 101, 871 P.2d 673 (1994).

■ Next, Defendants contend the length of an exceptional sentence must be proportionate to sentences in similar cases. We reject a proportionality review for compelling reasons.

First, when the Legislature intended a proportionality review, it specifically enacted that method of review and defined the relevant comparison base. RCW 10.95.130(2)(b). It has not done so in the SRA.

Second, the general declaration of purpose in RCW 9.94A-.010 does not overcome the controlling language of the substantive provisions of the SRA. When the Legislature intended consideration of the general declaration of purpose in the application of a particular procedure, it so provided. Only in RCW 9.94A.120(2) did it require specific consideration of the purpose of the SRA. This section relates only to the decision to *impose* an exceptional sentence, not to the *length* thereof. This explicit direction demonstrates how the substantive provisions are to satisfy the general declaration of purpose.

Third, to require now a proportionality review would be contrary to our consistent interpretation of RCW 9.94A-.210(4) and the Legislature's acquiescence therein.

Fourth, a proportionality review is inconsistent with RCW 9.94A.210(5) which limits review *solely* of the record before the trial court. An accurate record of all similar cases, with the same salient factors (whatever that means) would require proof of the facts of such cases from all other 38 counties. Who makes the choice? Who bears the burden to produce? Short of production of the entire trial record, how can the court determine what are the same salient factors? It appears obvious to us that the Legislature never contemplated such a burden and delay as would result from such a requirement and we decline to adopt it.

The other suggested requirements and limitations are rejected. These suggestions all inject a mechanical approach by a comparison to the average sentence to this particular crime throughout the state, or comparison to the average sentence for more serious crimes, or comparison to the midpoint of the standard range for this crime.

The purpose of the SRA is to structure, but not eliminate, discretionary trial court decisions. RCW 9.94A.010. Comparison with, but more importantly limitation by, standard sentences is inconsistent with the trial court having found substantial and compelling reasons to justify an *exceptional* sentence. Use of the word "exceptional", by definition, implies a deviation from the norm. Had the Legislature intended to tie the length of exceptional sentences to standard sentences or to correlate the length of exceptional sentences with the standard range of that crime or more serious crimes, it could have easily so provided. Instead, the statute is silent. Any such requirement is completely absent.

The statistics demonstrate rather conclusively that trial courts in fact adhere to the scheme of sentencing provided by the SRA. In 1992, 18,067 adult felony sentences were imposed. Only 372, 2.050 percent, were above the standard range. Washington Sentencing Guidelines Comm'n, *A Statistical Summary of Adult Felony Sentencing Fiscal Year 1992*, at 21.

We now consider the facts and sentences in each case.

Defendant Scott: The victim was murdered in her home in Seattle. She lived alone, and due to her condition was unable to take care of herself. She was cared for by her neighbor, Defendant's mother. Because of his mother's caretaking role, Defendant often did chores for the victim and had access into her home. Defendant knew of the victim's age and Alzheimer's condition.

The victim's body was found in the back bedroom by neighbors. Her face was badly beaten, and she had been strangled both manually and by use of a telephone cord, which was found bound tightly around her neck. She was naked from the waist down, and her blouse and sweater were pulled up. She had more than 20 broken bones, including multiple skull fractures, a fracture at the base of her skull, broken facial bones, two fractured vertebrae in her lower back, and numerous broken ribs. She suffered a subdural hemorrhage, and had two gaping lacerations on the top of her head. There was a faint contusion on the mons pubis. Her right hand had defensive-type wounds indicating she tried to ward off the attack. A broken glass candy jar lid and the victim's cane were determined to have been used in inflicting the injuries.

Pubic hairs which were removed from the victim's body and clothing contained the same microscopic characteristics as Defendant's hairs. Upon execution of a search warrant, police seized numerous pieces of evidence from Defendant's home, including two bloody socks, a T-shirt with bloodstains and tennis shoes. Blood comparison tests confirmed that the blood on the socks and shirt was consistent with the victim's blood but not Defendant's. A bloody shoeprint found at the murder scene was consistent with the size, tread pattern, and wear pattern of tennis shoes belonging to Defendant. Numerous matchbooks and burned matches had been found throughout the victim's home; two burned matches were found on her abdomen. During the search of Defendant's bedroom, the police found numerous burned matches and the same brand of matchbook which was found in the victim's home.

The police found signs of violence, including bloodstains and items displaced in the living room and two bedrooms in the 800-square-foot house. The victim's wallet had been rifled and its contents strewn on the living room couch, and her checkbook, found on her bed, had been opened.

Defendant, who was 17 years old at the time, was charged with first degree murder. The State alleged that the killing was premeditated and that it was committed during the course of furtherance of robbery and attempted rape. The juvenile court declined jurisdiction, and Defendant was tried as an adult. The jury found Defendant guilty on both theories. In response to special interrogatories, the jury found that the killing had been committed during a first degree robbery and attempted first degree rape.

The standard range term for first degree murder is 240 to 320 months. The trial court concluded that four aggravating factors justified an exceptional sentence outside the standard range. These factors are, at this stage of the proceedings, unchallenged: (1) Defendant's conduct manifested deliberate cruelty to the victim; (2) there were multiple injuries inflicted; (3) Defendant knew the victim was particularly vulnerable or incapable of resistance due to advanced age, disability, and health; and (4) Defendant used a position of trust to facilitate the crime. The trial court sentenced Defendant to 900 months.

Recitation of these facts and reflection upon the four horrid aggravating factors demonstrate that it was not an abuse of discretion to impose a 900-month exceptional sentence.

Defendant Ritchie: Defendant Ritchie pleaded guilty to a charge of first degree rape of a child. The victim was a $6\frac{1}{2}$-week-old baby girl.

On May 12, 1990, Defendant was visiting at the victim's family home. He had been a friend of the victim's mother for over 10 years, and during the year preceding the offense had visited the family frequently. At about 8 p.m. the victim's parents left the home, leaving their two young children in Defendant's care. They returned at about 9:30 p.m. When they returned, Defendant appeared nervous and up-

set. Defendant asked the parents if the baby had been ill recently, and then told them that when he changed her diaper he saw blood and when he checked further, he found that her vaginal area had been injured.

The victim's parents took her to the hospital. Her labia minora was mildly swollen, the inner part of the labia was bruised, there was a $1\frac{1}{2}$-centimeter tear from the bottom of the vagina toward the rectum, and her hymen was injured. The medical examination indicated penetration had occurred. Surgery was immediately performed, which took several hours. The baby was hospitalized for several days and was subjected to extreme pain and discomfort.

In Defendant's statement on plea of guilty he said: "On May 12, 1990, I had sexual intercourse with [the victim], age six and one-half weeks, by inserting my little finger into her vagina." Clerk's Papers vol. 1, at 8, 10.

At the time of the offense, Defendant was a 26-year-old chaplain's assistant in the United States Army who had a college degree in psychology.

Defendant's offender score was 0. The trial court imposed an exceptional sentence of 312 months in prison to be followed by 240 months of community supervision. Defendant appealed the exceptional sentence. The Court of Appeals in an unpublished opinion held that two of the reasons relied upon by the trial court for imposing the exceptional sentence were improper, including Defendant's future dangerousness, and remanded for resentencing.

A resentencing hearing was held. The trial court entered findings of fact (from which the above statement of facts is derived) and conclusions of law. The court concluded that "defendant's acts constituted a violation of a position of trust", and that "[t]he victim was particularly vulnerable and incapable of resistance due to her extreme youth." Conclusions of law 2, 3; Clerk's Papers, at 121. These aggravating factors had already been upheld by the Court of Appeals. The trial court also found that "[t]he nature and extent of the injuries inflicted were far more severe than

may reasonably be expected in the 'usual case' ". Conclusion of law 4; Clerk's Papers, at 122. The Court of Appeals had expressly said that on remand the sentencing court could consider whether the victim's injuries were more serious than in the usual case and thus could constitute an aggravating factor. The trial court also concluded that one of the SRA's purposes is to protect the community as well as the victim, that this purpose is served by granting an exceptional sentence in Defendant's case, and that "[t]he unique circumstances presented warrant extended confinement, as well as community placement supervision to both protect and prevent contact with the victim and her family." Conclusion of law 5; Clerk's Papers, at 122. The court concluded that:

> Substantial and compelling reasons exist to impose an exceptional sentence above the standard sentencing range of 51-68 months.
>
> A period of 312 months of confinement followed by 120 months of community placement supervision, is an appropriate sentence considering the nature of the offense and aggravating circumstances enumerated herein. Such a sentence will ensure the defendant's incarceration until the victim approaches adulthood. The court bases this sentence upon each and any one of the aggravating circumstances previously enumerated, and the identical sentence would be imposed even if only one of the aggravating factors was present.

Conclusion of law 8; Clerk's Papers, at 123.

The enormity of the vile act of Defendant upon a 6¹/₂-*week*-old child is apparent. Under the above definition of abuse of discretion, there was no abuse of discretion in the length of the exceptional sentence.

Defendant Hamrick: Defendant Hamrick was convicted of second degree assault. The victim was a 20-month-old boy (D.J.).

At the time of the offense, the victim was living with his mother and younger sister at an apartment in Centralia. The victim's mother was involved in a relationship with Defendant. On November 10, 1990, in addition to her own children, the mother was babysitting her nephew. Defend-

ant arrived and made dinner. The children were put to bed about 8:30 to 9:30 p.m. Defendant and the mother went to bed between 11:00 p.m. and midnight. Sometime during the middle of the night Defendant got up to take care of the children, who had awakened.

The next morning the mother awoke at 7 a.m. She got D.J. out of bed, and noticed that he was unable to stand on his right foot. Before this time, he had not had trouble walking. D.J. did not use his left hand to eat breakfast. After breakfast, Defendant took D.J. with him while he went to have his vehicle washed. During the day, D.J.'s condition worsened, and both his foot and elbow began to swell.

The mother took D.J. to a physician, who found fractures in the child's arms and ankle and referred him to an orthopedic clinic. The next day, the mother took D.J. to the clinic, where he was examined by a physician's assistant, Steven R. Fisher. The mother told Fisher about a fall down the steps. Fisher found five fractures in D.J.'s left and right arms and right ankle. He also discovered bruises on D.J.'s face, arm, and elbow. Fisher testified that his first impression was that D.J. had been abused. When he told the mother this, she said she believed Defendant had caused the injuries. Fisher also testified that the mother had a "flat affect", consistent with an abuser or one who was herself abused. Both Fisher and the radiologist who examined D.J.'s x-rays testified that the injuries were not consistent with a fall down several stairs. D.J. responded well to treatment and the fractures healed.

According to the mother, on November 12, 1990, Defendant called and explained that when he picked D.J. up out of his high chair after breakfast the morning of the 11th, he heard D.J.'s arm snap. He told the mother that someone else probably caused the other fractures. At trial, Defendant denied telling the mother he heard D.J.'s arm snap.

On November 16, 1990, Centralia police officer Blair questioned Defendant about D.J.'s injuries. Defendant denied

touching D.J., and, according to the officer's testimony, Defendant said he got up only to check on D.J.'s little sister when he woke up in the middle of the night.

The relationship between the mother and Defendant ended soon after D.J. was injured. Defendant subsequently became involved with another woman, who had an 18-month-old boy. She testified at trial that Defendant told her that he had abused D.J. many times by putting him under the car heater at full blast; forcing him to stand on heat ventilators until the bottoms of his feet were burned; bruising his heels where the injury would not be noticed; holding his head under water until he could not breathe, and then letting him back up; and inflicting bruises under the hairline so they would not be seen. He said he would do these things when the mother was not around or was in the shower. He also told this other woman that he would suffocate D.J.'s little sister until she turned purple and then perform infant CPR on her. He told her that he had lied to the Centralia police about causing D.J.'s injuries. After about 20 minutes of this recitation, he told her that he was joking. At trial Defendant denied making these statements, but conceded that what she said was "somewhat truth" in that on a couple of occasions D.J.'s little sister had stopped breathing and he had performed infant CPR.

On February 28, 1990, Defendant was charged with second degree assault of D.J. At trial, in addition to testimony summarized above, the State introduced over Defendant's objection other bad acts of Defendant. Two of these were initially ruled inadmissible by the trial court, but then were ruled admissible because the Defendant had opened the door to the evidence. The defense itself brought out that Defendant had allegedly assaulted the mother on October 19, 1990. The other incident involved Defendant pushing D.J.'s 10-month-old sister to the floor on the same day. Although Defendant argued to the Court of Appeals that the trial court erred in holding that the defense opened the door to this evidence, the

Court of Appeals refused to reach the issue as Defendant had not cited authority to support the argument.

Defendant was convicted of second degree assault. The standard range is 3 to 9 months. The trial court identified four aggravating factors which the court concluded justified an exceptional sentence outside the standard range: (1) Defendant's conduct manifested deliberate cruelty to the victim; (2) the victim was particularly vulnerable; (3) there was an ongoing pattern of abuse; and (4) Defendant utilized a position of trust to facilitate the commission of the crime. The court imposed an exceptional sentence of 84 months.

We find the sentences not to be clearly excessive.

The sentence in each case is affirmed.

DURHAM, C.J., DOLLIVER and SMITH, JJ., and ANDERSEN, J. Pro Tem., concur.

MADSEN, J. (dissenting) — Today the majority creates a "standard" that unjustifiably grants unbridled discretion in exceptional sentencing upward unless the statutory maximum is exceeded. In short, its holding amounts to saying that as long as a proper reason is found for departing from the standard range all departures upward are per se valid if they do not exceed the statutory maximums. This was never a result that the Legislature intended when it enacted the Sentencing Reform Act of 1981 (SRA), RCW 9.94A. The majority's holding is not only inconsistent with the SRA's commensurability purpose and intent to structure discretion, but it insures that no meaningful review can ever be had and that no common law principles to structure discretion will ever be developed for departure sentencing. RCW 9.94A.010; RCW 9.94A.210(6) (providing that opinions are to be issued when sentences are reversed and may be issued where the court believes that an opinion will provide guidance to others and in developing a common law of sentencing); *State v. Shove*, 113 Wn.2d 83, 88-89, 776 P.2d 132 (1989) ("A principal purpose of the SRA is to establish

guidelines for sentencing judges' discretion, thereby making the exercise of that discretion more principled and providing criteria for review by appellate courts."); David Boerner, *Sentencing in Washington* § 9-3, at 9-9 to 9-10 (1985) (noting that if common law were to be developed sentencing decisions would be based on principle and guided by reason and reform would be realized); Boerner § 9.1 (saying that Washington reform intended that flexibility exist but that exceptional sentences be justified by principled reasons); *see also ABA Standards for Criminal Justice: Sentencing* std. 18-8.2 commentary at 249-51 (3d ed. 1994) (stating that the mission for appellate review is to develop law that guides and constrains sentencing judges' use of their discretion). In holding as it does today, this court has abdicated the role the Legislature intended it have and has made review of aggravated sentences basically pointless.

The majority argues that the SRA dictates its result. A close examination of the SRA reveals quite the opposite. First, the majority argues that the SRA requires that its general declaration of purpose need only be considered by trial courts in deciding to *"impose"* an exceptional sentence and need not be considered by appellate courts when reviewing exceptional sentences. Majority, at 392. I disagree with both these statements. The general purpose of the SRA governs all its aspects consistent with the well established rule of construction that the purpose language of an act governs interpretation of all its provisions. *See, e.g., State v. Elgin,* 118 Wn.2d 551, 555, 825 P.2d 314 (1992) (holding that the spirit or purpose of an enactment should prevail over inept wording and that this court's "paramount duty" is to give effect to the Legislature's intent); *Pud 1 v. Wppss,* 104 Wn.2d 353, 369, 705 P.2d 1195, 713 P.2d 1109 (1985) (statute language must be read in the context of the entire statute and construed so as to be consistent with the general purpose of the statute). This court cannot pick and choose when it feels the general purpose should apply after the Legislature has determined this purpose to be applicable to the statute as

a whole. *See* RCW 9.94A.010 (defining the purpose of "this chapter"); *State v. Pascal*, 108 Wn.2d 125, 137-38, 736 P.2d 1065 (1987).

Nor does the operational language of the SRA support the majority's conclusions. RCW 9.94A.120(2) does not direct trial courts to consider the general purpose of the SRA only in their decision to sentence outside the standard range. Rather, RCW 9.94A.120(2) and (3) make sweepingly broad statements about trial judges setting out the reasons for the exceptional sentences they impose, which must logically be read to include reasons for the length of these sentences as well. To reach its result, the majority twists the word "impose" so as to make it appear synonymous with only the initial decision to depart from the standard range. In reality, however, the imposition of an exceptional sentence has two components — the initial decision to depart and the length of the sentence selected outside the standard range. Trial courts should therefore consider the general purpose of the SRA when deciding both of these components. RCW 9.94A.120(2).

Moreover, RCW 9.94A.210(4) does not preclude consideration of the general purpose of the SRA on review. To the contrary, it sets up broad bases for reversal when either the reasons for imposing an exceptional sentence are not supported by the record or are legally insufficient or the sentence imposed is clearly excessive or too lenient. RCW 9.94A.210(4). The SRA does not define when the reasons provided are insufficient or the sentence clearly excessive or too lenient. This absence makes it clear that the courts are free to develop, and actually expected to develop, standards by which compliance with the SRA can be measured. *See* RCW 9.94A.210(6) (stating that opinions should be issued to provide guidance and develop a common law of exceptional sentencing); *ABA Standards for Criminal Justice: Sentencing* std. 18-8.2 (purpose of appellate review is "to develop a body of rational and just principles regarding sentences and sentencing procedures"). Inherent in any court's analysis of

these statutory directives is what the general purpose is of the statute it is construing. *Elgin*, at 555; *State v. Fjermestad*, 114 Wn.2d 828, 835, 791 P.2d 897 (1990); *Shove*, at 89 (arguing interestingly enough that "this court has always interpreted the SRA in a manner that ensures the structuring of trial court discretion"); *Pud 1*, at 369; *ABA Standards for Criminal Justice: Sentencing* std. 18-8.2 (appellate courts "should seek to make effective the legislature's public policy choices regarding sentencing"). Furthermore, because trial courts must consider the general purpose of the SRA when imposing an exceptional sentence under RCW 9.94A.120(2) and appellate courts review these decisions, the general purpose of the SRA will necessarily have to be a part of appellate review. Thus, contrary to the majority's position, reference to the general purpose of the SRA is necessary to any review under the SRA.

Second, the majority rejects a requirement that trial courts articulate reasons for the length of the exceptional sentences they impose. Majority, at 392. To support its position, the majority misinterprets the provisions of RCW 9.94A.120 which provide that trial courts must set out their reasons for imposing exceptional sentences. RCW 9.94A.120(2)-(3). As mentioned above, these provisions do not specify which aspects of an exceptional sentence must have reasons. Nor do the provisions state that only reasons for going outside the standard range must be provided. Instead, the provisions generally state that exceptional sentences must be justified by substantial and compelling reasons which consider the general purpose of the SRA and are set down in writing by the trial court. RCW 9.94A.120(2)-(3). Because the statute does not limit the aspects for which reasons need be provided, the statute should be read to require reasons for all aspects of exceptional sentences, including reasons for the length of the exceptional sentence imposed. *See ABA Standards for Criminal Justice: Sentencing* std. 18-5.19 (3d ed. 1994).

The majority goes on to say that legislative silence is indicative of the Legislature's acquiescence in the abuse of

discretion standard. The majority's approach here misses the mark. Even assuming that the Legislature's silence is meaningful, its silence does not dictate that this court reject a requirement that trial judges provide reasons for imposing the length of an exceptional sentence. Requiring reasons for the length of exceptional sentences is not a rejection of the abuse of discretion standard but merely gives content to that standard. *See, e.g., ABA Standards for Criminal Justice: Sentencing* stds. 18-5.19, 18-8.2 (using abuse of discretion standard for appeals but requiring sentencing courts to provide reasons for the length of sentences in order to insure meaningful appellate review). As such, this is not something the Legislature has had any reason to address. Furthermore, the method by which abuse of discretion is measured is arguably something the Legislature is not likely to speak to since it decided to leave the exceptional sentence arena largely to the interpretation of the courts.

No one, not even the majority, attempts to argue that trial judges have no reasons for the length of the sentence they impose. To require the articulation of those reasons makes sense so appellate courts can determine whether a trial court abused its discretion by relying on improper factors. *See State v. Smith*, 123 Wn.2d 51, 59, 864 P.2d 1371 (1993) (Madsen, J., dissenting); *ABA Standards for Criminal Justice: Sentencing* std. 18-5.19 commentary at 213 (stating that a statement of reasons for the sentence imposed is "essential to meaningful appellate review of sentences" and particularly important when departing from the presumptive range). A number of cases from the Court of Appeals have correctly recognized this. *See, e.g., State v. Elsberry*, 69 Wn. App. 793, 796, 850 P.2d 590 (1993) (reasons must be stated in the record); *State v. George*, 67 Wn. App. 217, 227, 834 P.2d 664 (1992) (record must reflect reasons), *review denied*, 120 Wn.2d 1023 (1993); *State v. Dyer*, 61 Wn. App. 685, 689, 811 P.2d 975 (some tenable basis must be in the record), *review denied*, 117 Wn.2d 1029 (1991); *State v. Pryor*, 56 Wn. App. 107, 118, 782 P.2d 1076 (1989) (record must reflect reasons), *aff'd*, 115 Wn.2d 445, 799 P.2d 244 (1990).

In other areas, where we review only for an abuse of discretion, this court has said that trial courts should state reasons so that appellate courts can examine the trial courts' use of their discretion. For example, trial courts must specifically state the reasons for admitting certain kinds of evidence. *See, e.g., State v. Jackson*, 102 Wn.2d 689, 693-94, 689 P.2d 76 (1984) (requiring the court to identify the purpose for admitting evidence and balance prejudice on the record before admitting the evidence under ER 404(b)); *State v. Alexis*, 95 Wn.2d 15, 18-19, 621 P.2d 1269 (1980) (looking for balancing of probative value versus prejudice under ER 609). We have also required trial courts to record their reasons in a number of other areas where we review only for an abuse of discretion. *See, e.g., Biggs v. Vail*, 124 Wn.2d 193, 201, 876 P.2d 448 (1994) (requiring reasons for CR 11 sanctions); *In re Schuoler*, 106 Wn.2d 500, 513, 723 P.2d 1103 (1986) (requiring reasons for an order of electroconvulsive therapy for a nonconsenting patient). Yet under the majority's ruling here, when imposing an exceptional sentence a court need only provide reasons for departing from the presumptive sentence range. One has to wonder why exceptional sentencing should be any different, particularly in light of the role which the SRA has given appellate courts.

More importantly, this court itself has in effect dictated that reasons be provided by defining clearly excessive sentences to be those shown to be "clearly unreasonable, *i.e.*, exercised on untenable grounds or for untenable reasons, or an action that no reasonable person would have taken". *State v. Oxborrow*, 106 Wn.2d 525, 531, 723 P.2d 1123 (1986) (quoting *State v. Strong*, 23 Wn. App. 789, 794, 599 P.2d 20 (1979)). How can one determine whether a sentence is clearly excessive because it was based on untenable grounds or reasons unless those reasons are stated? Logically, this court cannot avoid requiring reasons and yet still define abuse of discretion in this manner. Moreover, not requiring reasons effectively develops a scenario where appellate courts will examine any reasons articulated by the trial

judge and may reverse, but where no reasons are stated, review will merely be perfunctory. Effectively this encourages trial courts not to specify any reasons and in fact creates a disincentive for doing so.

Providing reasons for the length of a sentence will also better accomplish the Legislature's goals in the sentencing area while the majority's result ignores the general purpose of the SRA altogether. Given the SRA's interest in structuring discretion across the board, reasons should be provided so we can examine that discretion.[1] *See* RCW 9.94A.010 (stating purpose is to structure discretion). Despite the majority's assertions, the reasons for the length of an exceptional sentence are often not repetitive. For example, a trial court may not be able to depart for a particular reason, but it may feel that the reason requires a longer sentence once it has departed for other reasons. *See, e.g., State v. McCune*, 74 Wn. App. 395, 397-98, 873 P.2d 575 (stating that while not justified reasons for departing, future dangerousness and other factors reasonably related to the defendant's culpability may be considered in setting length), *review denied*, 125 Wn.2d 1006 (1994); *State v. Ross*, 71 Wn. App. 556, 567-68, 861 P.2d 473, 883 P.2d 329 (1993) (allowing considerations of predatory behavior and dangerousness to influence sentence length for sexual offense where record did not support any finding of dangerousness that would justify departure); *George*, at 227 (noting that once departure is justified, other factors which are not sufficient to justify departure may be used to set the length of the sentence as long as they are related to the defendant's culpability); *State v. Hillman*, 66 Wn. App. 770, 778, 832 P.2d 1369 (saying that future dangerousness would be a justified consideration when setting length in nonsexual cases), *review denied*, 120 Wn.2d 1011 (1992). To be able to determine whether the trial court has relied on appropriate factors, the reasons for exceptional sen-

---

[1]The majority argues its result based on the fact that the SRA intends to structure but not eliminate discretion. Yet the majority's result does not structure discretion in any way. Instead it allows plenary discretion without effective review, returning exceptional sentences to the days pre-SRA.

tence length must be separately set out. Requiring reasons also fosters development of a principled common law on exceptional sentencing as the Legislature intended. Boerner §§ 9.1, 9.3.

Third, the majority rejects a "proportionality review", a catchy term which misses the fact that proportionality need only be one of many factors that should be considered by trial courts and would only begin to give content to the abuse of discretion standard. Majority, at 396-97. Since this court retains ultimate authority to review the trial court, proportionality considerations need not force the comparison of cases that cannot be compared or ratchet sentences downward because of a low baseline either. The majority itself admits that trial courts are directed by the Legislature to consider the general purpose of the SRA. Majority, at 391. Included in the general purpose of the SRA is both the intent to "[e]nsure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history" and to "[b]e commensurate with the punishment imposed on others committing similar offenses". RCW 9.94A.010(1), (3). Therefore, proportionality will necessarily have to be considered by trial courts. Furthermore, the Legislature considers the general purpose of the SRA when it determines the appropriate standard ranges. When trial courts depart from these ranges, it necessarily falls to the trial courts to consider the general purpose since they will not have the benefit of the Legislature's guidance as to appropriate length. Such consideration will better effectuate the intent of the SRA. *See State v. Solberg*, 122 Wn.2d 688, 710-12, 861 P.2d 460 (1993) (Madsen, J., dissenting) (arguing that, to fulfill the SRA's general purpose, proportionality should be considered in some form). Trial courts should articulate their reasoning to this effect on the record to facilitate review.

The majority's rejection of any consideration of proportionality on review principally relies on its erroneous assertion that the Legislature did not intend that proportionality be considered by the reviewing court. This analysis is not

sound. Because trial courts are directed by Legislature to consider the purpose of the SRA when imposing exceptional sentences, an appellate court is expected to consider proportionality at least to the extent a trial court did when it selected the length of the exceptional sentence. Moreover, to consider the intentions of the Legislature when reviewing an exceptional sentence under the SRA would not create any new rules of statutory construction. It would instead be more consistent with longstanding principles of statutory construction than the majority's result. *See, e.g., In re Young*, 122 Wn.2d 1, 22, 857 P.2d 989 (1993) (statute should be construed so as to best advance its legislative purposes); *Spokane Cy. Health Dist. v. Brockett*, 120 Wn.2d 140, 151, 839 P.2d 324 (1992) (preamble or statement of intent can be crucial to the interpretation of a statute); *Pud 1,* at 369 (language of a statute should be construed so as to be consistent with the general purpose of the enactment).

Next, the majority goes on to unjustifiably reject any comparison to the average sentence or standard range altogether. Majority, at 397. Once again, this court should give meaningful content to its abuse of discretion standard by encouraging trial judges to compare of the nature of the crime at issue to the typical crime. The standard ranges the Legislature has adopted for specific crimes provide a convenient and justified basis to use to compare sentences outside these ranges. Comparison to the standard ranges also more effectively insures that the Legislature's intent is carried out. This comparison is no more arbitrary, and arguably less so, than court decisions without any relation to these standards. Besides, any comparison is only meant to be a guideline. Room for discretion remains and this court retains the power to determine if a sentence based on such a comparison is justified.[2]

---

[2]One example of the kinds of proportionality standards that some courts have established is the Minnesota doubling rule. While this court has rejected the doubling rule as a presumption, there is no reason to foreclose trial courts from using a doubling approach as a guideline when determining the length of a sentence outside the standard range. Moreover, the decisions of this court

Before reaching the merits of the individual cases, the majority makes one last remark which requires comment. It apparently believes its result justified because in most cases "trial courts in fact adhere to the scheme of sentencing provided by the SRA". Majority, at 397. In effect the majority appears to be saying, whatever the length of these sentences, since the number is small there is no need to review the sentencing courts' discretion. While perhaps persuasive to the majority, I cannot agree that the infrequency with which exceptional sentences are imposed justifies an abdication of our responsibility to review the individual cases before us as the majority does today. In fiscal year 1994 alone, at least 298 exceptional felony sentences were above the standard sentence range. Another 246 exceptional felony sentences were below the standard range.[3] Washington Sentencing Guidelines Comm'n, *A Statistical Summary of*

---

rejecting the doubling analysis as a tool of review have by no means been unanimous. In both *State v. Oxborrow*, 106 Wn.2d 525, 723 P.2d 1123 (1986) and *State v. Armstrong*, 106 Wn.2d 547, 723 P.2d 1111 (1986), three Justices disagreed with the majority's rejection and interpretation of the Minnesota rule. As Justice Utter explained, the doubling rule neither requires that courts "automatically impose twice the presumptive sentence" nor considers double the presumptive sentence to be "an absolute upper limit". *Oxborrow*, at 544-45 (Utter, J., concurring in part, dissenting in part). The rule merely gives some guidance as to what is less likely to be considered an abuse of discretion while recognizing that not all cases fit the typical case it assumed when imposing the rule. The Minnesota rule "has helped Minnesota judges impose sentences that are more uniform and proportional, and empirically closer to the standards established by the Minnesota Legislature". *Oxborrow*, at 545 (Utter, J., concurring in part, dissenting in part) (citing Kay A. Knapp, *What Sentencing Reform in Minnesota Has and Has Not Accomplished*, 68 Judicature 181, 187 (1984)). Even Justices Andersen and Brachtenbach recognized that sentences which were twice the presumptive standard would be less likely to be considered an abuse of discretion than sentences closer to the statutory maximum. *Oxborrow*, at 538-39 (Andersen, J., concurring). In both cases, the dissenting Justices also properly recognized that the majority's abuse of discretion standard would "rarely, if ever," allow an appellate court to overturn the sentence a trial court has imposed and that such a result was contrary to the intent of the SRA. *Armstrong*, at 553 (Goodloe, J., dissenting); *see also Oxborrow*, at 542 (Utter, J., concurring in part, dissenting in part).

[3] In fiscal year 1994 alone then, the majority's holding would leave the length of a total of 544 exceptional felony sentences without any meaningful appellate review.

*Adult Felony Sentencing: Fiscal Year 1994*, at 19 (1995). If justified, these sentences would be acceptable, but the number alone does not make them justified. Each case should be examined on its own merits. Statistics do not insure justice.

Turning to the individual sentences in this case, the weakness of the majority's standardless abuse of discretion review is evident. The majority simply recites the facts of each crime and concludes without further comment that the sentences are not clearly excessive. Majority, at 399-404. Had the sentencing courts here provided reasons which explained the length of the sentences they imposed, including an examination of factors such as the general purpose of the SRA and a comparison of standard ranges, this court could engage in a meaningful review. Unfortunately, these sentencing courts provided no reasons for the length of the sentences they imposed and did not themselves examine the purpose of the SRA as applied to their cases or make any sort of comparison. However, an appellate review of these sentences which looks at the objective factors outlined above reveals that at least two of the defendants have received excessive sentences.

Defendant Ritchie was charged with first degree rape of a child for digital penetration of a baby girl. Ritchie had an offender score of 0 with a resulting standard range of 62 to 82 months. Washington Sentencing Guidelines Comm'n, *Implementation Manual* IV-60 (1994). The maximum sentence for this class A felony offense is life imprisonment. RCW 9A.20.021(1)(a). The trial court imposed an exceptional sentence of 312 months (26 years), over three times the top of the standard range. Besides exceeding double the standard range, this sentence is excessive given Ritchie's first offense status and the nature of the crime. Rape of a child in the first degree is committed when a defendant has "sexual intercourse" with a child less than 12 years old and the defendant was at least 24 months older than the victim. RCW 9A.44.073. Because his offense is defined as encompassing all "sexual intercourse", Ritchie's penetration of a

baby with his little finger is not more extreme, and arguably less serious, than the typical offense contemplated by the SRA. RCW 9A.44.010(1). The trial court based the sentence length on its desire to protect the victim, arguing that Ritchie's incarceration for this period would insure that the victim would have no contact with Ritchie prior to reaching adulthood. However, this reason is not sufficient to sustain Ritchie's sentence since he was not a family member of the victim, only a friend whose future contact could easily be cut off. Moreover, Ritchie was 26 years old, had a college degree in psychology, was a chaplain's assistant in the Army, and had never previously offended. By way of comparison, the sentence the trial court imposed falls within the standard range imposed for first degree murder despite the fact that here the child has recovered and because of her young age is unlikely to have any memory of the incident. The reason the trial court provided for the length of Ritchie's sentence is therefore not sufficient to sustain such an excessive sentence. Ritchie's case should be remanded for resentencing.

Defendant Hamrick was convicted of second degree assault of a young child. He had an offender score of 0 with a resulting standard range of 3 to 9 months. RCW 9.94A.310(1). Yet the trial court imposed an exceptional sentence of 84 months without giving any reasons for the sentence length. This is over nine times the upper end of the standard range and very close to the 10-year statutory maximum for this class B offense. RCW 9A.20.021(1)(b). This sentence well exceeds a doubling of the standard range. For a first-time offender, this sentence is also extremely close to the statutory maximum and extremely distant from the presumptive range. Another offender receiving the standard range for this offense would have to have nine or more convictions to receive such a lengthy sentence. Furthermore, the sentence imposed on Hamrick falls within the sentencing range of offenses such as first degree rape or attempted first degree assault of a child. Effectively, the trial court elevated Hamrick's crime to a

seriousness level of 11, a seriousness level which no class B offense reaches under the Legislature's standards. Washington Sentencing Guidelines Comm'n, *Implementation Manual* IV-23 to -28. If Hamrick was effectively going to be punished for a class A felony, he should have been charged with such a crime. The trial court should not be allowed to get there under exceptional sentencing. Hamrick's sentence is clearly excessive and should be remanded for resentencing.

Defendant Scott was convicted of the first degree murder of an elderly woman. He had an offender score of 0 with a resulting standard range of 240 to 320 months. Washington Sentencing Guidelines Comm'n, *Implementation Manual* IV-60. The trial court sentenced Defendant Scott to 900 months, nearly three times the top of the presumptive sentence range. Admittedly reasons existed for departing upward; however, the trial court provided no reasons for what is essentially life imprisonment without parole. Again, this sentence by far exceeds a doubling of the standard range. Additionally, it should be noted that the maximum term that can be imposed for such a class A felony is life imprisonment. RCW 9A.20.020. A sentence of 75 years effectively imposes the statutory maximum on 17-year-old Scott for his first offense. Effective life imprisonment without the possibility of release or parole is neither just nor fair when Scott was not charged with aggravated first degree murder.[4] RCW 10.95.020(9). This case should therefore be remanded for resentencing. If the trial court continues to believe that an exceptional sentence is appropriate, it should articulate reasons for the duration of its sentence which consider the factors outlined above.

When looked at objectively, which we as a court must do to insure that the general purpose of the SRA is carried out, Ritchie's and Hamrick's sentences are clearly excessive and must be remanded for resentencing. Scott's sentence should also be remanded for the trial court to reconsider the length of this sentence in light of the factors outlined here. Contrary

---

[4]Even assuming Scott received good time credit pursuant to RCW 9.94A.150, as a serious violent offender he would reduce his sentence by only 15 percent, or 11.25 years, and would still be in his eighties when released.

to the majority, I would reverse the sentences imposed in these cases and remand for resentencing which includes a statement of reasons for the length of the sentence chosen.

JOHNSON, J., and UTTER, J. Pro Tem., concur with MADSEN, J.

GUY, J. (concurring in the dissent) — I concur with Justice Madsen that trial courts must articulate reasons for the length of an exceptional sentence imposed. Inherent in the exercise of discretion is a reasoned decision on why use of that power is appropriate. The dissent would require the sentencing judge to state his or her reason for imposing an exceptional sentence. I agree, for without such a statement we are unable to determine whether the power was abused. Since a sentencing judge does not decide to apply an exceptional sentence without thinking about what sentence is appropriate, it is not a burden on the judge to provide on the record his or her thinking as to the appropriateness of the sentence.

Justice Madsen's discussion of the purpose of the SRA and the need for an appellate court to review the written basis for imposing an exceptional sentence is clear and well stated. I do not concur with the dissent in the discussion of proportionality or the doubling rule.

I join with Justice Madsen in concluding that the sentences of Defendants Ritchie and Hamrick are clearly excessive and should be remanded for resentencing. In the case of Defendant Scott, before an evaluation under abuse of discretion standards can be made, the record must contain the reasons for the sentence imposed.