# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59439-1-II |
| Respondent, | |
| v. | |
| GERRY GENE GREATREAKS, II, | PUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Gerry G. Greatreaks appeals his sentence for rape of a child in the first degree and two counts of child molestation in the first degree. Greatreaks argues that he was constructively denied counsel under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), because his defense attorney failed to do more to advocate at his sentencing hearing for the agreed upon sentence in his plea agreement. Greatreaks also alleges that the superior court abused its discretion by imposing an exceptional sentence that is clearly excessive and by imposing a community custody condition that is unrelated to his offense. We affirm.

FACTS

In November 2022, Greatreaks was charged with multiple sex offenses involving a "net nanny" operation.[1]

In January 2024, while he was on pretrial release for that case, Greatreaks was accused of a different sexual assault crime. A woman reported to Lewis County detectives that Greatreaks had sexually abused her nine-year-old son. The woman described that when she and Greatreaks were having sexual intercourse, on several occasions Greatreaks forced her son to participate in sexual activities with her.

Following an investigation into this new allegation, the State charged Greatreaks with four counts of first degree rape of a child, three counts of first degree child molestation, and one count of sexual exploitation of a minor.

In February 2024, Greatreaks reached an agreement with the State to plead guilty to both cases. As part of the global settlement, the State amended the information for the new case, dropping five of the eight counts.[2] The three remaining charges were two counts of first degree child molestation and one count of first degree rape of a child.

---

[1] A "net nanny" operation typically refers to a sting operation "designed to catch would-be sexual abusers before they have a chance to sexually assault an actual child." *See State v. Stott*, 29 Wn. App. 2d 55, 69, 542 P.3d 1018 (2023), *review denied*, 3 Wn.3d 1002 (2024). The operation generally involves law enforcement posing online as children or parents of children to offer opportunities for child sexual assault. *See generally id.* at 59 (describing a Washington State Patrol sergeant posing as a fictitious 13-year-old girl exchanging messages and setting up a meeting with the defendant as part of a net nanny operation).

[2] Our record does not include the original charges for Greatreaks' first case, but he pled guilty to two counts of attempted second degree rape of a child and five counts of first degree possession of depictions of minor engaged in sexually explicit conduct.

Based on Greatreaks' criminal history, the State agreed to recommend indeterminate sentences with the minimum sentences within the standard ranges. For the first degree child molestation charges, the State agreed to recommend a minimum sentence of 198 months, and for the first degree rape of a child charge, the State agreed to recommend a minimum sentence of 300 months. The State's agreement also included lifetime community custody and sex offender registration. The parties' joint recommendation for the earlier net nanny case was for a minimum sentence of 180 months, but the parties agreed to recommend that the two cases would run concurrently so that the total minimum time in custody was 300 months.

The superior court sentenced both cases at the same hearing. The State urged the superior court to adopt the agreement reached between the parties:

> I think the resolution that we've reached holds the defendant accountable, and it is a benefit to the State in that the victim doesn't have to relive these things, and—nor would he have to testify, potentially, against his own mother. Which I think would have been a very difficult thing to have occurred, given the things I know about the case.
>
> So while the crimes that are at issue, especially the second case, are very disturbing, and I think there's no way you get around that, this plea resolution allows this case to be resolved, and it significantly punishes the defendant. And that's why I've agreed to it. So I'd ask the [c]ourt to adopt the agreement that the parties have reached.

Verbatim Rep. of Proc. (Mar. 27, 2024) (VRP) at 17-18. The State also asked the superior court to impose standard community custody conditions and restitution for the victim.

The young victim then spoke to the superior court. The victim said that during his mother's relationship with Greatreaks, Greatreaks kicked him with a steel-toed boot, called him profane names, and threatened him with his fist. As a result of the trauma from Greatreaks' abuse, the

victim said that he had nightmares, that he "felt like [he] wasn't loved or cared about," and that he had attempted to kill himself. VRP at 20.

The defense counsel spoke next. He explained that Greatreaks' first case had been "dragging on for quite some time" and that he was Greatreaks' third attorney on the case. VRP at 21. Despite this and despite the complexities in both of Greatreaks' cases, the defense explained that they were able to negotiate an acceptable plea agreement with the State. Defense counsel stated,

> And as [the State] indicated, we have talked multiple times and negotiated quite a bit on both of these cases, and they are agreed recommendations in all respects with regard to both cases.

VRP at 21. Defense counsel made no further statement.

The superior court then thanked the parties for their statements and expressed appreciation for their ability to come to a plea agreement, especially given the benefit to the victim:

> Well, I appreciate the remarks from [the State] about how we got here. And I understand, having served many years as the prosecutor, the risks of going to trial and the damage that can be done—the severe damage that can be inflicted on victims who have to testify at trial.
>
> And so it's significant that Mr. Greatreaks gave up his right to a trial and saved everyone, and especially [the victim] from, having to testify in this case. Which, given the indignities that he's been through already, would be adding much more to that. So that's one of the . . . things that I value in somebody taking responsibility and sparing everyone the ordeal of having a case like this or cases like this go to trial.

VRP at 22.

When the superior court imposed its sentence, it departed from the parties' agreed recommendation. While the superior court agreed to the proposed minimum sentences in the plea

agreement, it imposed an exceptional sentence by running the sentences for the two cases consecutively, instead of concurrently, for a total of 480 months. The court explained,

> The departure is that, rather than run all of these concurrent, I am going to find substantial and compelling reasons to depart from the guidelines, and under 9.94A.535(2)(c), which indicates that the [c]ourt can impose an exceptional sentence when the defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished.
>
> [Greatreaks] has nine-plus points on each of these. I didn't count how many exactly he had on each of these counts, but each of them is nine-plus. And so I'm going to run Count[] I of the [first case] and Count III of the [second case] consecutive as an exceptional sentence.

VRP at 23. The superior court also imposed lifetime community custody, a lifetime sexual assault protection order for the victim, and required Greatreaks to register as a sex offender. Among other community custody conditions, condition 6 prohibited Greatreaks from consuming alcohol or drugs, and condition 9 required Greatreaks to submit to random urinalysis and breathalyzer tests.

Greatreaks appeals.

## ANALYSIS

Greatreaks makes three arguments in this appeal: (1) that he was constructively denied counsel under *United States v. Cronic*, 466 U.S. 648, (2) that the superior court erred by imposing a clearly excessive sentence, and (3) that his community custody condition related to drug and alcohol testing is not crime related.

I. CONSTRUCTIVE DENIAL OF COUNSEL

Greatreaks first alleges that during sentencing his attorney said so few words that he was constructively denied counsel under *Cronic*. 466 U.S. 648. We disagree.

Typically, a defendant brings an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). To prevail, they must prove that their counsel's conduct fell below an objective standard of reasonableness and that their counsel's deficient performance prejudiced the outcome of their case. *Id.* at 687-88. Counsel's errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. Greatreaks clarifies that he is *not* making a claim of ineffective assistance of counsel under *Strickland*.

Instead, Greatreaks points to the rare exception to *Strickland* derived from the United States Supreme Court decision in *Cronic*. 466 U.S. at 658-60. There, the Court recognized that there are some circumstances that are so likely prejudicial "that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. Prejudice will be presumed if a defendant can prove: (1) they have been completely denied counsel at a critical stage of trial, (2) their counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," constructively denying them counsel, or (3) their counsel, although competent, was put in a situation in which no attorney could provide effective representation. *Id.*; *see also State v. McCabe*, 25 Wn. App. 2d 456, 461, 523 P.3d 271, *review denied*, 1 Wn.3d 1014, 530 P.3d 186 (2023). Greatreaks argues that this case falls under the second *Cronic* category—constructive denial of counsel.

Claims for constructive denial of counsel are "few and far between" and "limited to [cases] in which the defendant's counsel was so uninvolved that the attorney may as well have not been present in court at all." *McCabe*, 25 Wn. App. 2d at 463. It is not enough that a defendant's counsel simply performed poorly—" 'bad lawyering, regardless of *how* bad, does not support the presumption [of prejudice]; more is required.' " *Id.* at 464 (alteration in original) (quoting

*McInereny v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990)). There must be a " 'breakdown in the adversarial process.' " *Id.* (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 675, 101 P.3d 1 (2004)).

"[T]he specific proceeding must [also] be viewed 'as a whole,' not by assessing any claimed ineffectiveness 'at specific points.' " *Id.* at 463 (quoting *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)). A defendant, for example, cannot isolate specific moments or comments within their counsel's closing argument to support a claim under *Cronic*, such errors " 'are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components.' " *Id.* at 463 (quoting *Bell*, 535 U.S. at 697-98).

Because denial of counsel claims under *Cronic* are rare, its application can be challenging and is heavily dependent on the specific facts. As noted by the Connecticut Supreme Court, even amongst multiple federal and state jurisdictions, "no consensus exists whether counsel's mere silence or lack of advocacy at a sentencing hearing amounts to a complete breakdown in the adversarial process." *Davis v. Comm'r of Corr.*, 319 Conn. 548, 557, 126 A.3d 538 (2015). *Compare Gonzalez v. United States*, 722 F.3d 118, 135-36 (2d Cir. 2013) (rejecting the application of *Cronic* even though defense counsel "did little more than simply attend" the sentencing hearing), *with Phillips v. White*, 851 F.3d 567, 572, 581 (6th Cir. 2017) (applying *Cronic* because defense counsel failed to investigate or present mitigating evidence and declined to make any argument or sentencing); *see also Warner v. Ford*, 752 F.2d 622, 625 (11th Cir. 1985) ("Whether [silence as a] strategy is so defective as to negate the need for a showing of prejudice to establish ineffective assistance of counsel must be judged on a case-by-case basis.").

A common thread among the cases addressing constructive denial under *Cronic* is whether any sort of strategic reasoning (or something reasonably in the defendant's interests) can be discerned in defense counsel's conduct. *See, e.g., United States v. Gooding*, 594 F. App'x. 123, 129 (4th Cir. 2014) (unpublished) (explaining that because the prosecution made statements favorable to the defendant and presented no evidence against him at sentence that it was reasonable for defense counsel to "sit back and let the Government do the talking");[3] *Davis*, 319 Conn. at 559-60, 564 (considering whether defense counsel's limited advocacy and agreement with the prosecution could be construed as strategic when deciding whether to apply *Cronic* or *Strickland*); *see, e.g., Florida v. Nixon*, 543 U.S. 175, 191-92, 125 S. Ct. 551, 160 L. Ed.2d 565 (2004) (holding that defense attorney's decision to concede defendant's guilt during capital case did not amount to constructive denial of counsel because it was a strategic choice to persuade the jury to not impose the death penalty).

When defense counsel is silent in the face of the State presenting evidence *against* the defendant, a constructive denial of counsel is more likely to be found. For example, in *Patrasso v. Nelson*, the State presented aggravating factors at sentencing and defense counsel made no response. 121 F.3d 297, 303-05 (7th Cir. 1997). The Seventh Circuit found a *Cronic* violation, reasoning that defense counsel not only "failed to offer mitigating evidence," but "[they also] made no effort to contradict the prosecution's case or to seek out mitigating factors." *Id.* at 304. Similarly, in *Gardiner v. United States*, the United States District Court for the District of Maine

---

[3] Federal Rules of Appellate Procedure 32.1 permits citing to unpublished federal judicial opinions issued after 2007 so long as they are designated as such. S*ee also* GR 14.1(b) (permits citing to unpublished decisions from other jurisdictions if permitted by the law of the other jurisdiction).

noted that defense counsel's silence was a complete failure because they did not "make a powerful, or even a weak, statement" in response to the State's presentation which characterized the defendant as " 'an amoral, antisocial individual, who has no regard for the rights or the welfare of other people or society in general.' " 679 F. Supp. 1143, 1146 (D. Me. 1988). In both cases, counsel's silence was an abandonment of the defendant in the face of the State's adversary litigation.

Greatreaks likens his situation to these egregious examples, arguing that his defense attorney was no more than "a warm body with a bar card." Reply Br. of Appellant at 2, 8. Greatreaks alleges that counsel's minimal comments constituted a complete failure to put the prosecution through adversarial testing. He counts the number of words spoken by his counsel and builds a bar graph that compares the words spoken (167) to the months imposed (480). He claims that even though his counsel was physically present, "he may as well have been absent." Reply Br. of Appellant at 11 (citing *Cronic*, 466 U.S. at 654, n.11). He further alleges that of the few comments his counsel made, some may actually have been harmful, such as comments that "[his] 2022 cases had been 'dragging on for some time' " and that he was Greatreaks' third attorney. Reply Br. of Appellant at 4.

We disagree that this case rises to the level of a *Cronic* constructive denial of counsel. Greatreaks' counsel was able to negotiate a plea agreement where the State reduced his charges from eight counts to three. The plea agreement also resulted in a joint sentencing recommendation that both counsel were obligated to support. *See State v. Molnar*, 198 Wn.2d 500, 512, 497 P.3d 858 (2021) ("In every case, the State has a 'good faith obligation to effectuate the plea agreement.' " (quoting *State v. Sledge*, 133 Wn.2d 828, 840, 947 P.2d 1199 (1997))). Then, the

State, speaking first, advocated for the joint recommendation with an explanation of the benefits of avoiding a trial while, at the same time, "significantly" punishing the defendant. VRP at 18. He finished with a strong personal endorsement of the agreement, stating, "And that's why I've agreed to it." VRP at 18.

Greatreaks' counsel's limited presentation must be viewed in the context of his hearing " 'as a whole.' " *See McCabe*, 25 Wn. App. 2d at 463 (quoting *Bell*, 535 U.S. at 697). The prosecutor made no detailed recitation of the egregious facts of crimes, nor can the prosecutor's statements reasonably be seen as disparaging Greatreaks. Moreover, the prosecutor gave a strong personal endorsement of the agreed recommendation. Unlike *Patrasso* and *Gardiner*, the State presented no evidence against Greatreaks. *See Patrasso*, 121 F.3d at 304; *Gardiner*, 679 F. Supp. at 1146. There was no clear need for defense counsel to actively advocate for the superior court to accept the plea agreement because the State had just done so. There was no abandonment of the defendant by defense counsel because there was no adversarial litigation to contest. On these facts, it was a viable strategy to "let the Government do the talking." *See Gooding*, 594 F. App'x. at 129 (unpublished).

Greatreaks appears to reject the idea that a limited presentation by defense counsel can ever be an acceptable strategy when sentencing on an agreed recommendation because the superior court can always depart from that recommendation. Such a view is too simplistic. One can readily conceive of different scenarios when an aggressive defense might be necessary, such as when the prosecutor fails to adequately support the agreement or when the prosecutor casts unfair aspersions on the defendant. But we have found no authority to suggest that a defense counsel is always required to aggressively advocate with an active presentation at an agreed sentencing in order to

10

avoid violating *Cronic*. Indeed, the opposite is true—there can be no blanket rule. Sometimes advocacy in a particular set of circumstances requires defense counsel *to say less*, sometimes it requires defense counsel *to say more*. *See Warner*, 752 F.2d at 625 (noting that defense counsel's silence can be strategic in particular circumstances).

From a review of the entire context of the sentencing hearing, this is not the rare case when a constructive denial of counsel under *Cronic* occurred. Thus, we hold that defense counsel's limited presentation at sentencing did not amount to a constructive denial of counsel or a breakdown of the adversarial process.

II. EXCEPTIONAL SENTENCE

Greatreaks separately argues that the length of his sentence is clearly excessive and shocks the conscience. We disagree.

We may review an exceptional sentence to determine whether the sentence is clearly excessive. RCW 9.94A.585(4). We review whether a sentence is clearly excessive for an abuse of discretion. *State v. Ritchie*, 126 Wn.2d 388, 393, 894 P.2d 1308 (1995). The superior court abuses its discretion when a sentence is based on untenable grounds or reasons or it is a decision no reasonable person would make. *Id.* If based on proper reasons, "we will find a sentence excessive only if its length, in light of the record, 'shocks the conscience.' " *State v. Kolesnik*, 146 Wn. App. 790, 805, 192 P.3d 937 (2008) (quoting *State v. Vaughn*, 83 Wn. App. 669, 681, 924 P.2d 27 (1996)), *review denied*, 165 Wn.2d 1050 (2009).

Greatreaks does not challenge the superior court's basis for the exceptional sentence; he only asserts that his "sentence shocks the conscience." Br. of Appellant at 26. Greatreaks claims he is not minimizing the seriousness of his crimes, but he argues that his defense counsel's failure

11

to investigate mitigating circumstances led to him having a one-sided sentencing hearing that ultimately led to an excessive sentence.

We disagree that Greatreaks' sentence shocks the conscience. The superior court commended Greatreaks for taking accountability for his crimes and pleading guilty, as well as the attorneys on both sides for negotiating a plea deal. Despite this, the superior court reasoned that his sentences should run consecutively because of the serious nature of Greatreaks' crimes and because his high offender score resulted in some of the current offenses going unpunished. Without question, Greatreaks' offender score was high and his crimes were horrific, involving sexual and physical abuse of a nine-year-old boy *while* Greatreaks was on pretrial release for net nanny charges. Given these circumstances, we cannot say that Greatreaks' sentence shocks the conscience.

III.  COMMUNITY CUSTODY CONDITION 9

Finally, Greatreaks challenges his community custody condition related to testing for drugs and alcohol. He argues that community custody condition 9, which requires him to submit to random urinalysis and breathalyzer testing, must be stricken because it is not "crime-related." Br. of Appellant at 28. The State concedes that neither drugs nor alcohol contributed to Greatreaks' crimes and, accordingly, condition 9 should be stricken.

We do not accept the State's concession. *See State v. Lewis*, 62 Wn. App. 350, 351, 814 P.2d 232, *review denied*, 118 Wn.2d 1003 (1991) (courts are not bound to accept an erroneous

concession from the State).  The challenged condition does not need to be crime related.  *See State v. Nelson*, No. 102942-0, slip op. at 27 (Wash. Mar. 27, 2025).[4]

In *Nelson*, our Supreme Court resolved a then-existing split among divisions of the Court of Appeals and held that a condition requiring random drug and alcohol testing does not need to be crime related.  *Id.*  *Nelson* noted that trial courts have statutory authority to impose prohibitions on drug and alcohol use.  *Id.*  And once imposed, *Nelson* explained that the State had a compelling interest in monitoring compliance:

> Protection of the public is achieved not merely by preventing similar crimes but by ensuring the person on community custody is willing and able to comply with all applicable legal requirements.  The State cannot possibly do so without the necessary tools "to monitor compliance with a validly imposed [sentencing] condition."  Thus, the State has a compelling interest in monitoring Nelson's compliance with his valid community custody conditions prohibiting drug and alcohol use, regardless of the specific facts of his underlying offenses.

*Id.* at 31 (alteration in original) (emphasis omitted) (quoting *State v. Olsen*, 189 Wn.2d 118, 126, 399 P.3d 1141 (2017)).

Here, consistent with *Nelson*, the superior court had the authority to impose conditions that prohibited Greatreaks from using drugs or alcohol.  Once these conditions were imposed, the superior court was also entitled to impose random compliance testing regardless of any role that drugs or alcohol may have played in the underlying crimes.  Thus, we affirm community custody condition 9.

---

[4] https://www.courts.wa.gov/opinions/pdf/1029420.pdf.

No. 59439-1-II

CONCLUSION

We affirm.

_____
PRICE, J.

We concur:

_____
VELJACIC, A.C.J.

_____
GLASGOW, J.