# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60288-1-II |
| Respondent, | |
| v. | |
| TREVOR BRENT SANCHEZ, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Trevor Sanchez hired AW, an 18-year-old girl with disabilities, to do odd jobs around his property. After AW had worked at his house multiple times, Sanchez asked her to rub oil on his knee to relieve pain. Sanchez then physically moved her hand to his penis and held it there for some time. When AW returned home, she and her family members reported Sanchez to the police. The State charged Sanchez with 1 count of indecent liberties by forcible compulsion.

Before trial, Sanchez unsuccessfully moved to compel the trial court to conduct an in camera review of AW's counseling records, seeking evidence AW told her counselor that Sanchez had not used force. At trial, AW stated that she felt she could not move her hand away, both because she knew Sanchez kept a gun under his pillow and because he was gripping her wrist. The jury delivered a guilty verdict as well as a special verdict finding that a vulnerable victim aggravator applied.

At sentencing, Sanchez chose not to speak on his own behalf. The trial court imposed an indeterminate sentence with a minimum term of 178 months, twice the high end of the standard

range and almost five years more than the state had requested, and a maximum term of life. The trial court discussed Sanchez's silence at sentencing, acknowledging that it was Sanchez's right not to speak but suggesting that his silence demonstrated "a total lack of remorse." The trial court stressed that the jury's vulnerable victim finding, and not Sanchez's silence or lack of remorse, was the basis for deviating from the standard range.

Sanchez appeals his conviction and sentence. He argues that there was insufficient evidence to prove forcible compulsion and that the trial court erred when it denied his motion to compel AW's counseling records. He also argues that the trial court impermissibly considered his silence at sentencing and that his sentence was clearly excessive.

We affirm Sanchez's conviction but reverse his sentence. Although the trial court stated that Sanchez's exercise of his constitutional right to silence was not its basis for departing from the standard range, it did not disclaim factoring his silence into the *length* of the exceptional sentence, which was almost five years longer than the State's requested exceptional sentence. Therefore, because the trial court said Sanchez's silence was part of its "mindset" at sentencing, we remand for reconsideration of his sentence length.

FACTS

I. BACKGROUND

In 2005, Trevor Sanchez was injured in a traffic collision that caused him permanent mobility issues and chronic pain. As a result, he regularly hired people to help him upkeep his home and property. In the summer of 2022, Sanchez posted an advertisement on social media seeking someone to do yardwork. AW, an 18-year-old high school student, responded to the posting and Sanchez hired her.

2

AW has a disability that manifests in part as a delay in speech and processing, difficulty with social cues, and a need for strict and repeated guidance and instruction for tasks that are new to her. Because of these challenges, AW's father, SG, accompanied her to Sanchez's property.

AW and SG first met Sanchez in Sanchez's bedroom, where he spent most of his time due to his disabilities. SG told Sanchez about AW's processing delays, trouble with social cues, and need for clear guidance. SG continued to accompany AW to Sanchez's house the next couple of times she went to work for him. Each time, they met with Sanchez in his bedroom, and Sanchez was lying in bed, clothed and covered in blankets.

Eventually, there was no more yardwork, and AW began doing housework for Sanchez instead. SG stopped accompanying AW to Sanchez's property, so AW came to Sanchez's property alone to do housework several times. Without SG present, Sanchez began to expose himself when AW came to speak with him in his bedroom; for instance, Sanchez removed blankets and allowed his nightgown to lift up, revealing his genitals. Sanchez told AW that this was okay and that nudity was "not a sin" if it was not sexual. 1 Verbatim Rep. of Proc. (VRP) (Jan. 29, 2024) at 174.

The last time AW worked for Sanchez, she entered his bedroom after cleaning out his shed and found that he was fully naked and not covered by blankets. AW told Sanchez that she had finished working and was going to call SG to drive her home. Sanchez told AW he would drive her home, which he had never done before, and he told her to sit in a chair near his bed.

Sanchez complained to AW about pain in his knee and asked her to massage it. He put lotion into her hand and, when her hand was on his knee, grabbed her hand and wrist to demonstrate how much pressure he wanted. Then, Sanchez moved AW's hand onto his penis and held it there for some time while he moaned into a pillow. AW was unable to pull her hand away because

3

Sanchez was gripping her wrist. AW was afraid to try to leave in part because Sanchez had told her he kept a gun under this pillow.

Afterward, Sanchez drove AW home. As soon as she got home, AW told her mother and grandmother what had happened. AW then reported the incident to the police.

The State charged Sanchez with 1 count of indecent liberties by forcible compulsion. The State also alleged that Sanchez "knew or should have known that" AW "was particularly vulnerable or incapable of resistance," an aggravating factor. Clerk's Papers (CP) at 10.

## II. AW's Counseling Records

Sometime after the incident with Sanchez, AW began attending counseling to deal with the aftereffects. Before trial, Sanchez filed a motion to compel in camera review of AW's counseling records. He argued that, although counseling records are generally privileged, an in camera review was warranted because AW must have disclosed the facts of the incident to her counselor. He reasoned that the records might therefore provide evidence that AW did not resist the contact with Sanchez or that Sanchez did not use force.

The State opposed the motion, arguing that Sanchez's assertion that the records may contain exculpatory evidence was too speculative to justify in camera review, and that Sanchez had no real need for the records because Sanchez had already deposed AW and gotten her version of events. The State added that to the extent Sanchez sought the records to obtain impeachment material against AW, he had failed to "show[] that AW said something different to the counselor to justify violating privilege." CP at 156.

4

At the hearing on the motion to compel, defense counsel emphasized that certain things AW may have said to her counselor would be highly relevant to Sanchez's defense, but conceded that the existence of such comments was speculative:

> [Defense Counsel]: So if she were to say, for example, "I went in and I rubbed lotion and then he asked me to touch him there and I just felt like I had no choice," that could be extremely relevant to the issue whether this is just potentially no crime or a gross misdemeanor, or if it's a felony allegation because there is forcible compulsion used or not. It's an enormous difference for my client, that forcible compulsion.
> THE COURT: I agree that it would be a big difference. But isn't that entirely speculative that that might be in these records?
> [Defense Counsel]: Yes. And that's why -- that's why we're only asking for it to be reviewed by Your Honor.

1 VRP (July 28, 2023) at 25-26. Defense counsel went on to argue that even though the contents of the counseling sessions were speculative, in camera review was still warranted because it was undisputed that the counseling was focused on the incident with Sanchez.

The State responded that "there's no evidence anywhere other than speculation that says that she gave any sort of details. In fact, details in counseling would be uncommon, and a counselor wouldn't press for further information." 1 VRP (July 28, 2023) at 29. The trial court denied the motion to compel because there was no more than speculation about what relevant information might be contained in the counseling records.

### III. TRIAL TESTIMONY

At trial, AW testified consistent with the facts recited above.

With regard to the level of force Sanchez used, AW explained that she touched Sanchez's penis because "[h]e had moved [her] hand there." 1 VRP (Jan. 29, 2024) at 181. The State elicited further detail from AW:

Q. And when you say he moved your hand there, what do you mean?
A. He grabbed my wrist and moved it for me.
Q. What did you do?
A. I was looking away, and I was thinking I wanted to get out of there, but I couldn't.
Q. When he grabbed your wrist, did you ever try to pull it away?
A. Yes, I did.
Q. Is this while your hand was on his penis?
A. Yes.
Q. Had you ever tried to pull it away before your hand --
A. Yes.
Q. -- got to his penis? And why were you not able to pull your hand away?
A. Because he had verified to me that he had a loaded gun underneath his pillow. And he also had guns up in his room, and he had told me that.
         . . . .
Q. How did you know that there was a loaded gun under his pillow?
A. Because he had told me a few times.
Q. Did he tell you at the time that he was asking for a massage, or before that?
A. Before that.
Q. So it was something you knew that he had a --
A. Yes.
Q. -- gun in his room. When you tried to pull your hand away, were you able to pull your hand away?
A. No.
Q. Why not?
A. Because he was gripping my wrist.

1 VRP (Jan. 29, 2024) at 181-83. Similarly, AW testified:

Q. How did your hand get on his penis?
A. He was grabbing my wrist, and he had moved my hand there.
Q. Did he just kind of guide it? Or was there any -- were you trying to pull your hand away?
A. Yes.
Q. So he was holding your wrist kind of hard, or how was he holding your wrist?
A. He was holding my wrist enough to get it there.
Q. Okay. While you were trying to pull your hand away?
A. Yes.

1 VRP (Jan. 29, 2024) at 205-06.

AW also testified that she asked Sanchez at one point if he was done, and that he told her, "Not quite yet." 1 VRP (Jan. 29, 2024) at 184. She testified that Sanchez kept his hand on hers

6

during most of the encounter. She said that during the brief time his hand was not on hers, she "tried moving [her] hand slowly away, and he put it back there and said it was okay." 1 VRP (Jan. 29, 2024) at 185.

AW testified that she could not remember how the encounter ended. After refreshing her memory with a transcript of her deposition, AW agreed that the incident ended when she told Sanchez, "'I'm done.'" 1 VRP (Jan. 29, 2024) at 203. Then AW clarified that it had not stopped the first time she had asked Sanchez if she could be done.

Defense counsel cross-examined AW about the gun that she alleged Sanchez kept under his pillow. AW agreed that Sanchez had told her he kept guns in his room prior to the day of the incident, but she claimed he also told her he had a gun under his pillow on the same day. AW later clarified further that Sanchez had not told her about the gun during or immediately before he asked for a massage, but at "[s]ome other point in the day." 1 VRP (Jan. 29, 2024) at 208.

The defense elicited testimony from AW that Sanchez did not directly threaten to harm her with the gun:

> Q. When he told you previously about the firearm, he was just telling you it was loaded; he didn't actually threaten you?
> A. Yes.
> . . . .
> Q. He didn't -- he didn't say he was going to hurt you that day?
> A. No.

1 VRP at (Jan. 29, 2024) 195.

Sanchez also testified at trial. Although he acknowledged he was naked on the day of the alleged incident, and he acknowledged in hindsight it was inappropriate to ask her to massage his knee and his thigh, he denied that he put her hand on his penis. He also acknowledged that he had multiple firearms in his bedroom, including a handgun that was sometimes under his pillow, but

Sanchez said he told AW about his handgun as a warning to be careful with it if she encountered it while cleaning.

At closing, the State argued that there was forcible compulsion because Sanchez physically stopped AW from pulling her hand away from his penis. It also argued that the presence of Sanchez's firearm under his pillow "put [AW] in fear that he would use it on her, and that is why she didn't feel like she could leave." 1 VRP (Jan. 30, 2024) at 330. The State claimed that "[t]here is no evidence that [Sanchez] said, 'Oh, I have this gun, don't leave,' but there is evidence that on more than one occasion he made sure to tell her that that gun was in his room." *Id.*

IV. VERDICT AND SENTENCING

The jury found Sanchez guilty. It also found, by special verdict, that Sanchez knew or should have known that AW "was particularly vulnerable or incapable of resistance." CP at 111.

Sanchez had two prior convictions: a 1988 misdemeanor conviction for indecent exposure and a 1996 felony conviction for second-degree child molestation. For the latter conviction, Sanchez had received a Special Sex Offender Sentencing Alternative (SSOSA). For the present conviction, Sanchez and the State agreed that Sanchez's offender score was 3 and the standard sentencing range for the indeterminate sentence would be a minimum of 67 to 89 months and a maximum of life.

The Department of Corrections compiled a presentence investigation report. At the request of defense counsel, the trial court ordered the Department not to contact Sanchez for the presentence report and it did not do so. The Department recommended an exceptional minimum sentence of 198 months (16 and a half years). To justify this recommendation, the Department noted Sanchez's previous history of sex offenses and wrote that "Sanchez has shown a history of

sexual deviancy and leaving victims for almost 40 years." CP at 118.[1] The Department noted that Sanchez "does not appear [to have] learned anything from his time in the SSOSA program," claimed that Sanchez's behavior might be "the longest pattern of sexual abuse that has been brought" before the court, and opined that Sanchez was likely to reoffend. CP at 118.

At the sentencing hearing, the State asked for an exceptional sentence with a minimum of 120 months and a maximum of life based on the special verdict finding that the victim was particularly vulnerable. The defense asked the trial court for a minimum sentence within the standard range, or at least "something significantly below 198 months." 1 VRP at (Apr. 3, 2024) 409. AW and her mother both spoke to the trial court about how the assault had affected AW and her family. The trial court then asked Sanchez if he would like to speak before being sentenced, and told him, "If you choose not to make a statement, I won't hold that against you." 1 VRP (Apr. 3, 2024) at 410. Sanchez elected not to make a statement.

The trial court sentenced Sanchez to an exceptional indeterminate sentence with a minimum of 178 months and a maximum of life in prison, a minimum sentence of nearly five years more than the State requested. The trial court explained that it arrived at the sentence by looking to the top of the sentencing range—89 months—and doubling it. The trial court stated that it started at the top of the sentencing range because of Sanchez's prior child molestation conviction.

The trial court next noted the jury's finding that the "particularly vulnerable victim" aggravator applied. 1 VRP (Apr. 3, 2024) at 411. The trial court stated that AW "was more vulnerable to this offense than a nondisabled victim," and added that the significant size difference

---

[1] It appears the Department also referenced a 2022 charge in the presentence report. This may have been the initial misdemeanor charge in this case that was ultimately dismissed when the more serious felony charge of indecent liberties by forcible compulsion was filed.

between AW and Sanchez also made her "physically vulnerable." 1 VRP at (Apr. 3, 2024) 411-12. At the close of its remarks, the trial court said:

> And I think these cases are always difficult. Clearly, there's not just one victim in this case either. I mean, there's a whole family, the community is affected by this kind of thing. And the pain -- this happened a long time ago, you know, it's been a long time since this happened, and it's still just as raw as it was. That doesn't go away.
>
> And so you know when *I balance that against the, I guess, what I'll call a total lack of any remorse. I didn't hear anything.* Mr. Sanchez didn't talk to the presentence investigator. That's his right. Didn't make a statement here today. And, again, that's his right. But *I take it for what it is, and that is a lack of any recognition of the impact that this case has had on [AW] and her family.*
>
> And so *that's kind of the mindset that I have. I'm not using that for the basis for the exceptional sentence. The exceptional sentence is based on the finding of the vulnerability that was found by the jury.* But I do make those observations.

1 VRP at (Apr. 3, 2024) 412-13 (emphasis added).

Sanchez appeals his conviction and his sentence.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

"A person is guilty of indecent liberties when [they] knowingly cause[] another person to have sexual contact with [them] or another . . . [b]y forcible compulsion." Former RCW 9A.44.100(1)(a) (2021). "Forcible compulsion" means "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to [themselves] or another person, or in fear that [they] or another person will be kidnapped." Former RCW 9A.44.010(6) (2020).

Sanchez argues that there was insufficient evidence to prove forcible compulsion because, in his view, the record does not support an inference that AW resisted Sanchez or that Sanchez

threatened her. Because the record contains evidence that AW resisted and Sanchez used physical force to overcome the resistance, we disagree.

When assessing whether sufficient evidence supports a conviction, we ask "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). "'[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn'" from it. *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

For purposes of forcible compulsion, force that overcomes resistance "requires more than the force normally used to achieve sexual intercourse or sexual contact." *State v. Ritola*, 63 Wn. App. 252, 254, 817 P.2d 1390 (1991). But it does not inherently require "a showing that the victim offered physical resistance." *State v. McKnight*, 54 Wn. App. 521, 525, 774 P.2d 532 (1989). Instead, "whether the evidence establishes the element of resistance is a fact sensitive determination based on the totality of the circumstances, including the victim's words and conduct." *Id.* at 526.

In *McKnight*, the defendant was convicted of second-degree rape based on a finding that he forcibly compelled a 14-year-old to have intercourse with him. *Id.* at 522. The defendant pushed the victim down onto the couch, removed her clothes, and penetrated her even though she repeatedly told him to stop. *Id.* at 522-23. Although there was "no evidence that the victim offered

physical resistance," *id.* at 524, the court held there was sufficient evidence for the jury to find forcible compulsion. *Id.* at 526. The court reasoned that "[a] reasonable fact finder could conclude that a rape victim who is unsophisticated about sexual matters and who has never been sexually active might only offer resistance commensurate with [their] limited understanding of what was occurring." *Id.* It further noted that the victim may not have struggled physically because "from her perspective, it would have been a futile gesture." *Id.* at 527.

Here, there is sufficient evidence in the record to support a finding that Sanchez overcame AW's resistance and forcibly compelled her to touch his penis. AW testified that Sanchez moved her hand onto his penis while she was trying to pull her hand away. She said she was unable to pull her hand away because Sanchez was gripping her wrist. She also testified that she tried to move her hand away during the brief time that Sanchez was not holding it, but that he moved it back.

Sanchez points out that the first time the State asked AW why she was unable to pull her hand away, she responded that it was because she knew he had a gun under his pillow. He argues that this must mean that "when [AW] said she 'tried' to move her hand away, she meant only that she wanted to move her hand away." Reply Br. of Appellant at 5. Thus, in Sanchez's view, when AW later said she could not move her hand "'[b]ecause he was gripping [her] wrist,'" she could only mean that she was mentally discouraged from pulling away because his hand was on hers. Reply Br. of Appellant at 6 (quoting record). Under deferential sufficiency of the evidence review we draw all reasonable inferences in the State's favor. AW's testimony was at least sufficient for the jury to draw an inference of force. A rational juror could have concluded that AW did not move her hand away because Sanchez was grabbing it too firmly.

Additionally, AW testified that when she asked Sanchez if she could be done touching him, he told her to continue. While she expressed less verbal resistance than the victim in *McKnight*, AW was also young, she had a disability that affected her social interactions and maturity, and she was sexually inexperienced at the time of the assault. She had no immediate way to leave the house—Sanchez was going to drive her home that day—and Sanchez had just ignored her request to stop. And she testified that Sanchez told her he had a gun under his pillow. Especially given that AW physically tried to move her hand away, a reasonable jury could find that she had offered sufficient resistance given the context, and that Sanchez forcibly overcame that resistance when he continued to hold her hand on his genitals. Thus, there was sufficient evidence to support the forcible compulsion element of Sanchez's conviction for indecent liberties with forcible compulsion.

Because the record contains sufficient evidence to prove that Sanchez forcibly overcame AW's resistance, it is not necessary to address whether there was sufficient evidence to prove that Sanchez threatened her.

## II. IN CAMERA REVIEW OF COUNSELING RECORDS

Next, Sanchez claims that the trial court violated his due process rights when it refused to review AW's counseling records in camera. We disagree.

Communications between mental health counselors and their patients are privileged by statute, subject to narrow exceptions. RCW 5.60.060(9). But in criminal cases, due process requires trial courts to review privileged records in camera if the defendant can make "a 'plausible showing' that the information will be both material and favorable to the defense." *State v. Gregory*, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006) (internal quotation marks omitted) (quoting

*Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n.15, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). "Evidence is material only if there is a reasonable probability that it would impact the outcome of the trial." *Gregory*, 158 Wn.2d at 892. We review a trial court's decision of whether to conduct in camera review for abuse of discretion. *Id.*

Although "[a]ny doubt regarding the records should be resolved in favor of conducting an in camera review," the defendant must "provide[] a nonspeculative basis for seeking the records." *State v. Jobe*, 34 Wn. App. 2d 471, 483, 569 P.3d 331 (2025). A claim that the records "may contain information critical to the defense is not sufficient." *State v. Diemel*, 81 Wn. App. 464, 469, 914 P.2d 779 (1996).

In *Jobe*, a woman had a privileged conversation with a victim advocate after being sexually assaulted by a rideshare driver. 34 Wn. App. 2d at 475-476. The driver, who was charged with second-degree rape, sought in camera review of the records of conversations between the victim and the victim advocate. *Id.* at 483. He argued that there was a nonspeculative basis for believing the records would be material because the victim advocate had told police that the victim "'was having some difficulty in determining how far in the prosecution she wanted to participate.'" *Id.* (quoting record). The driver contended that the victim advocate's notes were therefore likely to contain evidence that undermined the victim's credibility or her confidence that the encounter was nonconsensual. *Id.*

The trial court denied in camera review, and Division One affirmed, pointing out that because there are many reasons a victim may be reluctant to proceed with prosecution, "the possibility that [the victim] may have discussed consent with [the victim advocate] [was] too

speculative." *Id.* at 484-85. Additionally, the court reasoned that the defense had an opportunity to cross-examine the victim at trial about her hesitancy. *Id.* at 485. The *Jobe* court relied in part on *Diemel,* noting that in that case the Court of Appeals upheld a denial of in camera review where the defendant offered no more than speculation that the rape victim in that case "may have discussed" the rape with her therapist. *Id.* at 484 (citing *Diemel*, 81 Wn. App. at 466).

Sanchez relies on *Gregory*. In *Gregory*, a defendant charged with rape sought in camera review of the alleged victim's confidential dependency files. 158 Wn.2d at 793. In that case, the alleged victim had previously engaged in sex work but maintained that she no longer did so; the defendant claimed that he had paid her for consensual intercourse. *Id.* at 794-95. The Washington Supreme Court ruled that the trial court should have held an in camera review of the dependency files on the grounds that "evidence of recent, factually similar [sex work] would have been" material, and "that if the Department of Social and Health Services . . . were aware of any recent [sex work] activity, it would have been addressed in the dependency files." *Id.*

Sanchez argues that like in *Gregory,* the details of how much force he used to compel AW to touch him "were both (1) critical to his defense and (2) very likely to have been discussed in the counseling sessions." Br. of Appellant at 36. While Sanchez now characterizes the level of force as "very likely" to have come up in counseling, he expressed less confidence to the trial court. In his motion to compel, Sanchez argued that the trial court must conduct in camera review if "some showing has been made that [the counseling records] *may* contain" information relevant to trial. CP at 147 (emphasis added). And while Sanchez's counsel argued in their written motion that it was "implausible that at a bare minimum, AW did not disclose to the counselor the facts of the incident," CP at 147, at the hearing defense counsel admitted that it was "entirely speculative"

15

whether AW had discussed the degree of force used with her counselor. 1 VRP (July 28, 2023) at 25.

This case is more like *Jobe* than *Gregory*. In *Gregory*, the court acknowledged that the information the defense sought "would have been" present in the dependency files, 158 Wn.2d at 795, whereas here the defense merely speculated to the trial court that material evidence *may* be in the counseling records. Additionally, Sanchez had an opportunity both to depose AW and to cross-examine her at trial, so AW's testimony regarding the level of force used was available. To the extent Sanchez sought impeachment material in the counseling records, he had even less of a basis than the defendant in *Jobe*, who was denied in camera review of the victim's records even though there was evidence the victim had expressed uncertainty about proceeding with prosecution to the victim advocate. Here, there is no evidence that AW told her counselor anything that would contradict her testimony.

We hold that the trial court did not abuse its discretion when it denied in camera review of AW's counseling records. We therefore affirm Sanchez's conviction.

### III. CONSIDERATION OF SILENCE AT SENTENCING

Next, Sanchez claims that the trial court violated his constitutional right against self-incrimination by considering his silence at the sentencing hearing. Sanchez argues that the trial court impermissibly determined that he lacked remorse because he chose not to speak at the sentencing hearing, and that this purported lack of remorse contributed to the length of his sentence. Sanchez concedes that "[t]he trial court properly based the initial departure" from the standard range "on the jury's special verdict" finding that AW was a particularly vulnerable victim. Reply Br. of Appellant at 14. But he argues that the trial court impermissibly factored his silence

into its determination of the *length* of the exceptional sentence, which was almost five years longer than the State requested.

The State does not dispute that it would be constitutional error for the trial court to punish Sanchez for his silence at the sentencing hearing, nor does it dispute that the trial court inferred a lack of remorse from Sanchez's silence. Instead, the State argues that the trial court did not err because it explicitly "based its exceptional sentence on" the jury's particularly vulnerable victim finding and not on Sanchez's silence or purported lack of remorse. Resp't's Br. at 29.

It was improper for the trial court to reference Sanchez's exercise of his constitutional right to silence at sentencing. And although the trial court expressly said it was not basing Sanchez's exceptional sentence on his silence, it did not say that Sanchez's silence had no impact on the *length* of the exceptional sentence imposed—which was almost five years longer than the State's request. Because the trial court said its "mindset" at sentencing included consideration of Sanchez's silence, 1 VRP (Apr. 3, 2024) at 413, we reverse Sanchez's sentence and remand for reconsideration of its length.

A.     Legal Standards for the Right to Silence and Lack of Remorse

The federal and state constitutions protect a person's rights against self-incrimination coextensively. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). This right to silence applies at sentencing, where self-incriminating statements could otherwise enhance the defendant's sentence. *State v. Tinkham*, 74 Wn. App. 102, 108, 871 P.2d 1127 (1994).

Once the jury has found an aggravating factor supporting an exceptional sentence, and the sentencing judge has found substantial and compelling reasons to impose an exceptional sentence,

the sentencing court "may exercise its discretion to determine the length of an appropriate exceptional sentence." *State v. Knutz,* 161 Wn. App. 395, 410, 253 P.3d 437 (2011). Therefore, when setting the length of an exceptional sentence, courts are generally permitted to factor a defendant's willingness to take responsibility or lack of remorse into consideration. But a court may not infer a lack of remorse from a defendant's exercise of their right to silence at sentencing. *State v. Ramires*, 109 Wn. App. 749, 766, 37 P.3d 343 (2002). "Refusing to admit guilt or remaining silent is an exercise of one's rights, not an indication of lack of remorse." *Id.*

In *State v. Garibay*, the trial court gave the defendant an exceptional sentence based in part on "lack of remorse." 67 Wn. App. 773, 777, 841 P.2d 49 (1992), *abrogated on other grounds by State v. Moen*, 129 Wn.2d 535, 919 P.2d 69 (1996). The defendant said little at the sentencing hearing, apparently due to a language barrier, and "the [trial] court noted [the defendant] had not expressed any remorse to the investigating officer who prepared the presentence report." *Id.* at 781. Division Three of this court held that under these circumstances, the trial court violated the defendant's constitutional right to silence when it based his exceptional sentence on his supposed lack of remorse. *Id.* at 782. The *Garibay* court affirmed the trial court's imposition of an exceptional sentence on the grounds that the trial court had identified other, valid bases for departing from the standard range. *Id.* But it remanded "for reconsideration of [the sentence's] length" without factoring in lack of remorse. *Id.*

B.     Trial Court's Comments at Sentencing

We acknowledge that the trial court explicitly said at sentencing that it was Sanchez's right not to speak at the hearing, and that it was imposing an exceptional sentence based on the jury's finding of vulnerability, not Sanchez's silence. However, the trial court only denied that it used

Sanchez's silence and supposed lack of remorse as "the basis for the exceptional sentence." 1 VRP (Apr. 3, 2024) at 413. Whether something was a *basis* for imposing an exceptional sentence that deviates from the standard range is a separate inquiry from whether something was a factor in that exceptional sentence's *length*. And a defendant's exercise of their right to remain silent is an impermissible consideration for either aspect of sentencing. *See State v. Ross*, 71 Wn. App. 556, 568, 861 P.2d 473 (1993) (noting that when "'determining the length of the [exceptional] sentence,'" factors that are not "'related to the defendant's culpability'" may not "'be considered by the sentencing judge.'" (quoting *State v. George*, 67 Wn. App. 217, 227, 834 P.2d 664 (1992), *overruled on other grounds by State v. Ritchie*, 126 Wn.2d 388, 894 P.2d 1308 (1995)).

The trial court perceived from Sanchez's silence "a total lack of any remorse," specifically relying on the fact that "Sanchez didn't talk to the presentence investigator" and '[d]idn't make a statement" at the sentencing hearing. 1 VRP (Apr. 3, 2024) at 413. The trial court said that it took Sanchez's choice to remain silent "for what it is, and that is a lack of any recognition of the impact that this case has had on [AW] and her family." *Id.* The trial court did not identify any other reasons why it believed Sanchez was not remorseful or did not appreciate the impact of his crime on the victim and her family. The trial court's inference from Sanchez's silence was impermissible. Thus, the question becomes whether the trial court considered its inference that Sanchez lacked remorse when determining the length of the sentence.

At the end of the hearing, the trial court discussed Sanchez's silence and perceived lack of remorse and then immediately stated, "so that's kind of the mindset that I have." *Id.* The trial court then mentioned the impact of the case on the victim and her family and "balance[d] that against

the . . . total lack of any remorse" based on Sanchez's silence. *Id*. It is not clear what it would mean to "balance" these factors if they were not being considered as contributors to the sentence's length.

Although the trial court said that Sanchez's silence was not the basis for the exceptional sentence, it did not say that Sanchez's silence was not a reason for the length of the sentence imposed, which was almost five years longer than the exceptional sentence that the State requested. The trial court's disclaimer does not persuade us that Sanchez's silence did not affect the *length* of the exceptional sentence imposed. Because the trial court improperly discussed Sanchez's exercise of his constitutional right to silence and said that this was "the mindset" the trial court had at sentencing, we conclude that Sanchez's silence influenced the sentence in the absence of comprehensive assurances by the trial court that it did not. Because the trial court expressly inferred that Sanchez lacked remorse because of his silence without making it clear that this did not influence the sentence's *length*, we hold that the trial court improperly considered Sanchez's silence.

Although it was not error to impose an exceptional sentence because the jury found the aggravating factor that AW was a particularly vulnerable victim, we remand for reconsideration of the sentence's length without the improper consideration of Sanchez's silence at sentencing.[2]

---

[2] Sanchez makes two additional arguments. First, he argues that his sentence is clearly excessive because it is based on untenable grounds and its length "shocks the conscience." Br. of Appellant at 46. Although as discussed above, we agree with Sanchez that the trial court's consideration of his silence was an untenable ground, we conclude that the sentence imposed was not otherwise clearly excessive. Sanchez's attempt to compare his sentence to sentences handed down in other sex offense cases is unavailing because we do "not engage in a proportionality review to determine whether the sentence is comparable to sentences in other similar cases." *State v. Fletcher*, 20 Wn. App. 2d 476, 491, 500 P.3d 222 (2021).

CONCLUSION

We affirm Sanchez's conviction but reverse the sentence and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

LEE, J.

VELJACIC, A.C.J.

---

Sanchez also argues that if we remand, the resentencing hearing must come before a different judge. However, as the State points out, the sentencing judge in this case has since retired, rendering this issue moot.